1  LYNN M. DEAN (Cal. Bar No. 205562)
   Email:  deanl@sec.gov
2  CHRISTOPHER A. NOWLIN (Cal. Bar No. 268030)
   Email:  nowlinc@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8
9                    **UNITED STATES DISTRICT COURT**
10                   **CENTRAL DISTRICT OF CALIFORNIA**
11

12  | SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:21-cv-5273 |
    |---|---|
13  | Plaintiff, | **COMPLAINT** |
14  | vs. | |
15  | MATTHEW J. SKINNER, EMPIRE WEST EQUITY, INC., LONGACRE ESTATES, LP, BAYSIDE EQUITY, LP, FREEDOM EQUITY FUND LLC, and SIMPLE GROWTH, LLC, | |
16  | | |
17  | | |
18  | | |
19  | | |
20  | | |
21  | Defendants. | |
22

23      Plaintiff Securities and Exchange Commission ("SEC") alleges:

24                    <u>**JURISDICTION AND VENUE**</u>

25      1.    The Court has jurisdiction over this action pursuant to Sections 20(b),

26  20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§

27  77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the

28

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because defendant Matthew J. Skinner ("Skinner") resides in this district and defendant Empire West Equity, Inc. ("Empire West") has its principal place of business here.

## SUMMARY

4.     Between 2015 and 2020, Defendants raised over $9 million from over 100 investors through general solicitation, for four real estate investment projects (collectively, the "Offerings").  Skinner misappropriated substantial amounts of investor money from each offering to sustain an his personal lifestyle, including financing an Aston Martin and a Maserati, and to finance his marketing and fundraising efforts.  Skinner has also made multiple false statements to investors to conceal his fraudulent conduct, including blaming the economic impact of the COVID-19 pandemic for the failure to make payments.

5.     Defendants made misrepresentations and misused investor money in the Offerings, as follows:

- <u>Longacre</u>.  Defendants raised $2.4 million by representing to investors that they would use the money to purchase and develop four hilltop residential lots in Granada Hills, California.  Instead, Defendants

2

diverted over $1.2 million from the project, using it for marketing costs, personal expenses, and a different real estate project.

- Bayside. Defendants raised $3.1 million, telling investors that they would receive an interest in the development of two waterfront homes in Newport Beach. Defendants misrepresented the extent of Skinner's interest in this project, inflated the projected returns, and sent only $2 million to the project, spending the remaining $1.1 million on unrelated things, including substantial personal expenses.

- Freedom Fund. Defendants raised over $2.6 million to purchase and renovate an Arizona apartment building. Skinner ultimately sent over $1.1 million to his Empire West entity, while failing to pay back 16 retail investors roughly $800,000 in principal at the end of the investment (money he still owes them).

- Simple Growth. Defendants raised over $1.3 million, telling investors he would invest their money in multifamily real estate, and guaranteeing double-digit returns "no matter what." Skinner spent the investor funds on general payroll, personal expenses, and Ponzi-like payments, never putting the money into real estate projects that could generate the high returns he promised.

6.    By this conduct, all of the defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In addition, Skinner violated Section 15(a) of the Exchange Act.

7.    The SEC seeks permanent injunctions against future violations of Sections 5 and 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5; disgorgement with prejudgment interest; and civil penalties against all Defendants; as well as a permanent injunction against Skinner against future violations of Section 15(a) of the Exchange Act. In addition, the SEC seeks permanent injunctions against Skinner that enjoin him from, directly or indirectly,

3

including but not limited to, through any entity owned or controlled by him, (i) participating in the issuance, purchase, offer, or sale of any security in an unregistered offering, provided, however, that such injunction shall not prevent him from buying or selling securities for his own personal account; or (ii) obtaining or receiving any additional funds, payments, or other forms of consideration related to or derived from Longacre Estates, LP or Bayside Equity, LP, or the underlying real estate development projects in which those entities are invested, and (iii) order him to provide a copy of the final judgment in this action to 2209 Bayside, LP and to any third party that has reached any agreement in principle to purchase any interest or right held by Bayside Equity, LP or Longacre Estates, LP, including their interests and rights with respect to the underlying Bayside or Longacre real estate projects.

## THE DEFENDANTS

8.      Skinner, age 46, is a resident of Santa Clarita, California.  Skinner is the 100% owner and manager of defendant Empire West,  and exerts complete managerial control over the following entity defendants: Longacre Estates, LP ("Longacre Estates"); Bayside Equity, LP ("Bayside Equity"); Freedom Equity Fund LLC ("Freedom Fund"); and Simple Growth, LLC ("Simple Growth") (collectively the "Offering Entities", and collectively with Skinner and Empire West, "Defendants").  Skinner has a criminal history that includes being convicted of assault with a deadly weapon.  Skinner has never held any securities license, and has never been registered with the SEC in any capacity.

9.      Empire West is a California corporation with its principal place of business in Santa Clarita, California.  It is a real estate investment firm run by Skinner.  It is not registered with the SEC in any capacity and it has not registered any offerings of its securities.

10.      Longacre Estates is a California limited partnership with its principal place of business in Santa Clarita, California.  Since 2016, the offering documents for Longacre Estates have indicated that its general partner is Empire West.  Longacre

4

Estates is not registered with the SEC in any capacity and it has not registered any offerings of its securities.

11.    Bayside Equity, is a California limited partnership with its principal place of business in Santa Clarita, California.  The general partner of Bayside Equity was initially a Texas limited liability company controlled by Skinner, but Skinner holds out Empire West as the actual general partner of Bayside Equity.  Bayside Equity is not registered with the SEC in any capacity and it has not registered any offerings of its securities.

12.    Freedom Fund is a California limited liability company with its principal place of business in Santa Clarita, California.  The managing member of Freedom Fund is Empire West.  Freedom Fund is not registered with the SEC in any capacity and it has not registered any offerings of its securities.

13.    Simple Growth is a Delaware limited liability company with its principal place of business in Santa Clarita, California.  The managing member of Simple Growth is Empire West.  Simple Growth is not registered with the SEC in any capacity and it has not registered any offerings of its securities.

## THE ALLEGATIONS

**A.    Skinner's General Business Operations and Manner of Raising Money**

14.    Skinner claims to be a successful real estate dealmaker and investor. From 2015 to 2020, Skinner raised money for a number of real estate investment projects, including projects to purchase, renovate, and sell apartment buildings, as well as projects to develop upscale residential properties.

15.    During this period, Skinner oversaw dozens of employees and independent contractors through his operating entity Empire West, over which he exercises control and decision-making authority.

16.    From 2015 to 2020, Skinner's primary operations centered on marketing the Offerings and on raising money from investors.  Skinner did not register any of the Offerings with the SEC, and for each Offering, he solicited and raised money

from investors in multiple states.  The Offering documents indicated that Skinner was purporting to rely on exemptions from registration under Rule 506.

17.    Defendants engaged in general solicitation for each offering, broadly targeting members of the public with whom they had no preexisting relationship.

18.    For each of the Offerings, Skinner exercised control over all investor communications, providing the content for and approving the offering documents.

19.    Skinner also directly communicated with and solicited prospective investors.

20.    Skinner purchased lists of supposedly accredited investors and hired sales representatives who he directed to cold call the people on these lists to pitch the Offerings.  Skinner supervised the sales representatives and created and approved the scripts that the sales representatives used when making these calls.

21.    Skinner also actively encouraged the sales representatives to organize or attend in-person networking events and market the Offerings.  Skinner often attended in-person networking events to market the Offerings himself.

22.    Skinner also made extensive use of social media and the internet to find investors, including targeted Facebook ads and touting his investment opportunities on publicly available websites, YouTube, and social media accounts.

23.    Skinner supervised the sales personnel and paid them commissions on their sales.

24.    Defendants purported to be raising money from only accredited or sophisticated investors.  While in some cases investors signed lengthy subscription agreements that included clauses stating they were accredited, Defendants raised money from multiple unaccredited investors in each of the Offerings, often without requesting any information from them concerning their finances or sophistication.

25.    The Simple Growth offering website stated that "[a]nyone can invest in Simple Growth" and that investors need not be accredited or sophisticated.  Multiple Simple Growth investors were not accredited, and were not asked to provide

1    information about their net worth or sophistication.

2        26.    Many investors invested money from their retirement accounts, which

3    Skinner actively encouraged.

4        **B.    The Longacre Offering**

5        27.    In 2015, Skinner began raising money for Longacre Estates, which he

6    marketed as a project to purchase a large piece of residential land in Granada Hills,

7    California, subdivide it into lots, and then prepare the lots for development or build

8    the homes himself, before selling the improved properties at a substantial profit.

9        28.    Skinner raised money for the Longacre Offering through his entity,

10   Defendant Longacre Estates, selling limited partnership interests to investors.

11       29.    Skinner raised over $700,000 for Longacre in 2015.

12       30.    He then raised an additional $1.65 million between June 2016 and

13   March 2017, in what he described as the "Longacre Round 2" offering.

14       31.    Skinner offered the Longacre Round 2 investors a 20% share of the

15   project profits, which was in addition to the 25-30% profit share sold to the 2015

16   investors.

17       32.    Skinner represented to all Longacre investors that he would spend the

18   majority of the money they invested on items necessary to develop and subdivide the

19   Longacre lots, including hiring architectural and engineering professionals, grading

20   the lots, and installing roads and utilities.

21       33.    As manager of the Longacre Offering, Empire West was entitled to a

22   share of any profits at the end of the project.  The Longacre Round 2 PPM provided

23   for only one specific fee payable to the manager— a "one-time Asset Management

24   Fee of $120,000."

25       34.    Skinner and Longacre sales representatives marketed the Longacre

26   offering via an undated written prospectus (the "Longacre Round 2 prospectus"),

27   which they provided to putative investors.

28       35.    The Longacre Round 2 prospectus stated that the money raised would be

used to "complete the subdivision, record final mapping, have 4 homes designed, construct a private drive with a cul-de-sac, install all utilities, and make the four lots ready to build with a decorative security gate on the property." It further stated, "Once completed, we will have four ready to build lots with a private drive and gate and will utilize bank financing to develop the four homes."

36.     The Longacre Round 2 prospectus included a detailed budget that projected that $2.4 million (the approximate total amount raised across Longacre Rounds 1 and 2) would be used on various land and construction costs, including "Land Purchase" ($900,000), "Final Mapping Subdivision" ($400,000), "Associated Costs Fees" ($100,000), "Private Drive Construction & Utilities" ($700,000), and "Design Development" ($300,000).

37.     The Longacre Round 2 prospectus projected a 28% return on investment for investors if four homes were built, and a 47% "ROI" for the project as a whole if only four "ready to issue" lots of land were sold.

38.     In or around May 2016, Skinner personally presented the Longacre Round 2 prospectus in a "Longacre Pitch" video presentation that he posted on a publicly available YouTube link. He and Longacre sales representatives provided a link to the video to prospective investors. In the video presentation, Skinner reviewed the prospectus' budget and touted the projected 28% return for Longacre Round 2 investors as being a very good return.

39.     Skinner stated in the video that the Longacre investment was "IRA approved" and a "fantastic vehicle for retirement," stating that once people invested all they would have to do is "cash big fat checks" when the property sold.

40.     Skinner and the Longacre sales representatives also marketed the Longacre Round 2 in a private placement memorandum dated May 12, 2016 ("PPM") that they provided to investors.

41.     The Longacre Round 2 PPM projected net proceeds after offering costs of $1.4 million, to be used as follows: "(i) $300,000 to hire the architect, engineer, a

landscape architect, pool design and interior design; (ii) $700,000 to grade the lots, trash removal and tree removal; (iii) installation of utilities, roads, curbs, gutters, and the entry gate; and (iv) funds to cover contingencies and shortfalls in our projections."

42.     The Longacre Round 2 PPM mentioned only one specific fee payable to Skinner — a "one-time Asset Management Fee of $120,000."

43.     Based on these written and oral representations, investors understood that the money they invested would be spent on the actual Longacre project, and more specifically that it would be spent on development items as laid out in the budget in the prospectus that they received from Skinner and his representatives.

44.     It was important to the Longacre investors that the money they invested be used for the specific Longacre development project and specifically development items like those referenced in the prospectus.

45.     The high returns that Skinner projected for the Longacre project were also important to the investment decisions of the Longacre investors.

46.     Skinner exercised full control over the Longacre bank accounts.

47.     The great majority (approximately $1.2 million) of the money Skinner raised in Longacre Round 2 did not go towards developing the Longacre property. Skinner instead directed roughly $950,000 to Empire West's bank account, which he used to finance marketing and fundraising activities, Empire West operational costs unrelated to the Longacre project, and his personal living expenses.

48.     Skinner also transferred $220,000 of investor funds to help finance the down payment on the Tides apartment building that was part of the separate Freedom Fund Offering.

49.     It was important to Longacre investors that Skinner not take any fees beyond those fees disclosed in the offering documents.

50.     Skinner never told prospective Longacre investors that he would take hundreds of thousands of dollars of fees or compensation out of the money invested

by Longacre investors and not put that money into the actual Longacre project.

51.     Skinner never told Longacre investors that he would use any of the funds they invested to pay for his own personal living expenses.

52.     Investors would not have invested in Longacre Estates had they known that Skinner would use any of their funds to pay for his own personal living expenses.

53.     Skinner never told investors that he would use any of the funds they invested in Longacre Estates to pay for his business's general marketing and fundraising expenses, or to finance his payroll expenses.

54.     Investors would not have invested in Longacre Estates had they known that Skinner would use any of the funds they invested in Longacre Estates to pay for his business's general marketing and fundraising expenses, or to finance his payroll expenses.

55.     Skinner never represented to investors that he would use any of the money they invested to finance other real estate projects besides the Longacre Offering he marketed to them.

56.     It was important to investors that Skinner use the money they invested to finance the Longacre Offering and not to finance other real estate projects.

57.     Under the terms of the Longacre offering, investors are entitled to receive a return of their principal and then at least 50% of profits upon the sale of the lots.

58.     The Longacre development project is still not complete, and the investors, who invested well over four years ago, have yet to receive back any part of their $2.4 million in principal, or any profits.

59.     In October 2020, Skinner informed Longacre investors that he had entered into contracts to sell two of the Longacre lots—"lot one" for $1.1 million and "lot two" for $1 million.  These transactions are contingent on Skinner taking a number of additional steps to prepare the lots for development, which include subdividing the lots, grading them, installing utilities, and building a private

driveway.

60.     Skinner does not currently have the money to perform these tasks because he spent all the investor money years ago.  He has indicated to investors that the additional costs may exceed $1 million.

61.     Between October 2020 and February 2021, Longacre Estates received purchase deposits for two Longacre lots totaling $233,000.  Skinner directed roughly $175,000 of this away from the Longacre project and spent it on personal expenses and unrelated general operational costs.  Skinner falsely represented to investors that he used this deposit money on the Longacre project.

**C.     The Bayside Offering**

62.     In 2015, Skinner, through his entity, Defendant Bayside Equity, began raising money for the Bayside Offering, a project to build two multi-million dollar homes on the harbor in Newport Beach, California.

63.     Bayside Equity did not have an ownership or management interest in this development project.  Instead, Bayside entered into an agreement with 2209 Bayside, LP ("2009 Bayside"), one of the developers.  Under the terms of this agreement, Bayside Equity was to make an unsecured loan of up to $2 million to 2209 Bayside in exchange for 7.5% annual interest and a 20% share of future project profits allocable to 2209 Bayside, which itself has an approximately 45% interest in the entire development project.

64.     Skinner marketed the Bayside Offering pursuant to a PPM dated June 10, 2015 (the "Bayside Offering PPM"), which he and the sales representatives provided to putative investors.

65.     The Bayside Offering PPM estimated that of the $2.3 million raised, $2,250,000 would be used for a project called "2209 Bayside," with Skinner as manager entitled to take "a one-time expense reimbursement fee of $50,000."  The PPM stated that the manager "shall not receive any additional compensation from [Bayside Equity] for their services to [Bayside Equity] unless specifically set forth in

this Private Placement Memorandum."

66.     A "Notice of Exempt Offering of Securities" that Bayside Equity filed with the SEC in June 2016, which was signed by Skinner, indicated that the amount of the gross proceeds of the Bayside Offering paid to the manager was $50,000 for "Expense reimbursement to general partner."

67.     Skinner represented to prospective investors that Bayside Equity would be entitled to 20% of the profits from the full Bayside project.

68.     The Bayside Offering PPM stated, "Investors in this Offering will also receive their pro rata share of 20% of the net profits realized from the development and eventual sale of the Property."

69.     In reality, under its agreement with 2209 Bayside, Bayside Equity was not entitled to 20% of the net profits from the Bayside project as a whole, but rather 20% of 45% of the project profits.

70.     Skinner also marketed the Bayside Offering using an undated prospectus.

71.     The prospectus stated that, "For an investment of $100,000 you can be a Limited Partner in this deal (.043%) and we anticipate producing approximately 90% return within 18 months for the partners."

72.     This projection was based on the false assumption that Bayside Equity would receive 20% of the profits for the entire project.  It was also based on the assumption that Bayside Equity's investment in 2209 Bayside would be $2 million or $2.3 million and that this would be the amount of principal that would have to be repaid at the end of the investment.

73.     In another prospectus that Skinner provided to prospective Bayside investors, he projected an estimated gross profit for the full project of $19,600,000 and stated, "A **$100,000** investment should provide a **26%** return on investment." (emphasis in original).

74.     This projection was also based on the false assumption that Bayside

Equity would receive 20% of the profits for the entire Bayside project. This was also based on the assumption that Bayside Equity's investment in 2209 Bayside would be $2 million or $2.3 million and that this would be the amount of principal that had to be repaid at the end of the investment.

75.     The high returns that Skinner projected were important to the investment decisions of the Bayside investors.

76.     Investors understood based on the written and oral representations they received that the money they invested would be going into the specific Bayside development project.

77.     It was important to investors that the money they invested go into the specific Bayside development project.

78.     Skinner, who had exclusive control over the Bayside investor funds, raised substantially more money than he actually sent to the Bayside project.

79.     Between June 2015 and February 2018, Skinner raised roughly $3.1 million from 51 investors. Of this, he sent only $2 million to the 2209 Bayside project entity. This amount was fully funded by April 15, 2016, but Skinner continued raising money through Bayside up until February 2018, raising upwards of $600,000 after Bayside Equity had stopped sending money to the Bayside project.

80.     Between July 2015 and November 2017, Skinner directed over $800,000 of Bayside investor funds to the Empire West corporate account, which he used to finance his marketing, fundraising, and operational costs unrelated to the Bayside project, and over $200,000 in personal expenses and transfers to his personal account.

81.     More than $200,000 of the Bayside investor money that went to Empire West was used to pay Skinner's personal expenses, either through direct payments of such expenses out of the Empire West account, or through transfers from the Empire West account to Skinner's personal bank account.

82.     Skinner also transferred an additional $75,000 of Bayside investor funds through other accounts under his control to his personal account.

83.     In addition, between January and March 2018, Skinner sent over $175,000 in Bayside investor funds directly from the Bayside Equity bank account to his personal bank account, using it to pay personal expenses like support payments to his ex-wife, luxury car payments, payments to his ex-girlfriend, and rental payments for his residence.

84.     In nearly every instance, Skinner diverted the Bayside investor money away from the project within a short period of time after receiving it, often misappropriating the money. For example, between April 21, 2016 and April 28, 2016, Skinner received over $210,000 in Bayside investments, and by May 2, 2016 he had directed $205,000 of that money away from the Bayside project. Similarly, Skinner received a $50,000 Bayside investment on May 24, 2017 and within a week directed that money to an intermediary account before sending it on to Empire West and his personal account. He did the same with another $50,000 investment on July 7, 2017, which he diverted away from the Bayside account on July 10, 2017. From January to March 2018, in each instance where he received an investment, Skinner transferred the money (which totaled over $175,000) from the Bayside bank account to his personal checking account.

85.     It was important to investors that Skinner not take any fees beyond those fees that he disclosed, as him taking such fees instead of putting that money into the project could cut into the profits they could achieve on their investments.

86.     Skinner never told Bayside investors that he would use funds they invested to pay for his personal living expenses.

87.     Investors would not have invested in Bayside had they known that Skinner would use any of their funds to pay for his own personal living expenses.

88.     Skinner never told Bayside investors that he would use funds they invested to pay for his business's general marketing, fundraising, and payroll expenses.

89.     Investors would not have invested in Bayside had they known that

Skinner would use any of the funds they invested to pay for his business's general marketing, fundraising, or payroll expenses.

90.     When he solicited investors, Skinner led many of them to believe he owned and managed Bayside, often describing it as his project in oral conversations with investors and in videos he posted on YouTube.

91.     In reality, Skinner has never had any managerial authority over the Bayside project, and has had virtually no involvement in the development process.

92.     Investors in the Bayside Offering have yet to receive back their principal.  When the Bayside properties are eventually sold, Skinner will owe Bayside investors roughly $3.1 million in principal but will have to pay that out of the proceeds of only a $2 million investment.

93.     The Bayside project will need to pay off substantial debts and other stakeholders before Bayside Equity receives any money.

**D.     The Freedom Fund Offering**

94.     In early 2017, Skinner began raising money for the Freedom Fund Offering, which he pitched to investors as a fund to purchase, renovate, and then refinance or sell undervalued apartment buildings in Arizona.

95.     Skinner originally pitched Freedom Fund as a fund that would invest in multiple buildings; however, the only specific asset that he ever identified was the Tides at 40th, an apartment building in Arcadia, Arizona.

96.     The Tides was the only asset in which the Freedom Fund ever invested.

97.     In February 2017 conference calls with investors and offering documents he provided to investors, Skinner claimed that the Freedom Fund would generate substantial profits when he sold or refinanced the improved property, while also generating ongoing cash flow from rent-paying tenants.  He repeatedly emphasized that investors would receive a 7% preferred return, claiming that investors would receive any gains or profits before management.  After reaching the 7% threshold, additional cash flow would go 60% to investors and 40% to the manager.

98.    In conference calls with investors and offering documents he provided to them, Skinner repeatedly projected annual returns for Freedom Fund investors of at least 15-18%.

99.    Skinner initially marketed the Freedom Fund offering pursuant to a PPM dated February 1, 2017, which he and/or his sales representatives provided to investors.

100.    Skinner told investors that he would use their money to make investments in multi-family real estate, including the Tides property.

101.    The first Freedom Fund PPM did not specifically mention the Tides property and instead spoke generally of Arizona apartments. However, Skinner emphasized the Tides in his pitch to the earliest investors, who all believed they were investing in that specific project.

102.    On various early 2017 investor calls, Skinner personally touted the Tides property.

103.    He and sales representatives also provided these earliest investors with a presentation that described at length the Tides property and included a detailed budget that showed essentially all the money raised going into either the purchase of, or renovations to, the Tides.

104.    Skinner used the money raised from the earliest Freedom Fund investors to finance the March 2017 down payment on the Tides property.

105.    Towards the end of 2017, Skinner restyled the Freedom Fund Offering as solely an investment in the Tides rather than a fund that would invest in multiple apartment buildings.

106.    Skinner marketed the restyled offering pursuant to a revised PPM, which was dated February 2017, but which he began providing to putative investors in late 2017.

107.    The revised PPM included a "use of proceeds" section that projected that $2.8 million of the anticipated $3 million raised would go to the Tides project. That

same PPM indicated that the offering manager, Empire West, would only be charging a one-time acquisition fee of $200,000, with one presentation stating that "[n]o other fees are charged." The general structure of the deal in terms of the 7% preferred return and the 60/40 split of profits between investors and the manager remained the same.

108.   Between February 2017 and August 2018, Skinner raised over $2.6 million from at least 47 investors for the Freedom Fund. Skinner exercised exclusive control over the Freedom Fund bank account. Skinner directed nearly $950,000 of investor funds to the Empire West bank account.

109.   Skinner used this misappropriated money to finance payroll, marketing and fundraising activities, operational expenses unrelated to the Tides project, and to pay his personal expenses.

110.   In multiple instances, Skinner used new investor money to make Ponzi-like quarterly distribution payments to other Freedom Fund investors, though he had touted to investors that the distribution payments would be sourced from rental income from the Tides building. For example, in November and December 2017, Skinner used Freedom Fund investor money to make over $20,000 in quarterly distribution payments to other investors. In January and February 2018, he financed over $18,000 in quarterly distribution payments with investor money. He used investor money again to make roughly $30,000 in quarterly distribution payments in May and June 2018.

111.   Skinner's fraudulent conduct continued after the sale of the Tides property in August 2019. On August 12, 2019, the Freedom Fund bank account received over $3.2 million, which reflected Freedom Fund's share of the proceeds from the sale of the Tides property, after the payoff of the Tides property mortgage and Skinner's other deal partners.

112.   Skinner used $840,000 of this $3.2 million to pay the balance of what he owed on a $1 million dollar loan he had taken out to help finance the Tides

property down payment.  Skinner ended up paying over $240,000 in interest on this loan, which he never disclosed to Freedom Fund investors.

113.   Skinner also transferred roughly $170,000 of the Tides sale proceeds from the Freedom Fund bank account to the Empire West bank account in August and September 2019.

114.   An internal analysis performed at Skinner's direction on or around August and September 2019 by Empire West's bookkeeper and accountant showed that Skinner had insufficient remaining funds to pay all the Freedom Fund investors' capital contributions of over $2.6 million, let alone the substantial returns he had consistently touted.

115.   Skinner took a number of steps to conceal the Freedom Fund shortfall and make the Offering appear profitable.

116.   First, Skinner decided not to repay Longacre the $220,000 Skinner had sent to Freedom Fund in March 2017.

117.   Then, Skinner and Freedom Fund sales representatives persuaded eight Freedom Fund investors to "roll over" more than $400,000 in total principal into the Simple Growth Offering, discussed in more detail below.  Skinner wired $500,000 from the Freedom Fund bank account to the Simple Growth bank account on September 17, 2019.

118.   Skinner and Freedom Fund representatives convinced Freedom Fund investors to roll over their funds into the Simple Growth Offering by falsely telling them that the Freedom Fund Offering had been profitable for them.

119.   The Freedom Fund investors who agreed to rollover their principal into Simple Growth would not have agreed to this had they known that the Freedom Fund Offering had not in fact been profitable.

120.   Lastly, to conceal the shortfall on the Freedom Fund Offering, Skinner decided not to pay back 16 of the earliest Freedom Fund investors who had invested roughly $800,000 in principal between February and July 2017.

121.   To justify his failure to pay back these investors, Skinner told them they were invested in the Freedom Fund itself and not just the Tides property, and that they were locked into the Fund for a set period of time.

122.   In reality, Freedom Fund never invested in anything besides the Tides property, and it had no other assets.

123.   By not paying back these 16 investors, Skinner was able to use the proceeds from the Tides sale to pay back other investors their principal with purported "profits."  After Skinner paid back these investors, the Freedom Fund bank account was depleted, even though Skinner still owed the 16 investors their roughly $800,000 in principal.

124.   On September 12, 2019, Skinner emailed multiple Freedom Fund investors announcing that the Tides sale had closed a few weeks earlier and promising investors that he would shortly be sending them a closing report on the investment and account statements.  In this email, Skinner stated that the average return on investment for Freedom Fund investors was 23%.  He also stated, "Freedom Fund investors, your money is already in rout [sic] for the next deal by way of Simple Growth.  Simple Growth is a holding account, much like how a Money Market account works as a holding account while the investor shops for new stocks bonds or mutual funds.  In Simple Growth, you will earn 12% on your combined principle [sic] + profit until we select our next deal together, which will be imminent."

125.   Skinner's September 12, 2019 email was directed to multiple Freedom Fund investors, including investors whose principal he never repaid.  These Freedom Fund investors never consented to Skinner continuing to hold their money after the sale of the Tides property, either in the Freedom Fund or by rolling it over into Simple Growth.

126.   One Freedom Fund investor ("Investor O") responded to Skinner's email on September 18, 2019, telling Skinner he wanted to withdraw his money.

127.   On September 28, 2019, Skinner texted Investor O in response to his

request for his money back, saying, "$50K investment in Freedom Fund, 2/27/2017 on a three year commitment." Skinner continued, "Already earned 23%; We sold one of the properties in the fund, Tides at 40th, and we rolled your principle [sic] balance in the fund ($55,120.63) into a 12% interest bond until the next property . . . In February 2020 you will have the opportunity to renew or withdraw."

128.   In reality, the Tides property had not been profitable for Investor O, and Skinner had never transferred Investor O's investment into another investment opportunity.

129.   Investor O had always understood that the Tides property was the Freedom Fund's only investment and believed the investment would conclude when that property sold.

130.   Investor O never consented to Skinner continuing to hold his investment after the sale of the Tides property.

131.   Similarly, on February 11, 2020, another Freedom Fund investor who had not been paid back, Investor S, responded to Skinner's September 12, 2019 email announcing the Tides sale, saying he wanted to cash out his principal and profits.

132.   On February 21, 2020, Skinner directed Empire West's accounting department to send Investor S an email with the subject line "Tide Closing Statement and Project Report." The email contained two attached documents. One of the two documents attached to the email was titled, "Freedom Equity Fund, LLC, Closing Statement: Tides at 40th Street," which was dated August 30, 2019. This attachment indicated that Investor S had achieved a $3,370.63 profit from the sale of the Tides property and that his overall ROI was 21%. This statement also indicated that his new principal balance was $53,370.63. This document stated further stated, "We would like to thank you for your investment in the Freedom Equity Fund. Your new principle [sic] balace [sic] will be put back into the fund that will accrue with 12% compounded interest. It will remain in this account until either our next equity deal, or you can opt to cash out at the anniversary of your third year from date invested."

133.   The second document attached to the February 21, 2020 email to Investor S was an account statement, indicating that Investor S had achieved compounded interest of $1,601.19 for the fourth quarter of 2019 and that this had been added to his principal investment to give him a new balance of $54,971.82 in the Freedom Fund.

134.   In reality, the Freedom Fund was not profitable for Investor S, and Skinner never transferred Investor S's principal or supposed profits into another investment opportunity.

135.   Investor S had always understood that the Tides property was the Freedom Fund's only investment and that the investment would conclude when that property sold.

136.   Investor S never consented to Skinner continuing to hold the money he invested after the sale of the Tides property.

137.   Skinner made similar false statements to the other Freedom Fund investors whom he elected not to repay.  After the sale of the Tides property, many investors tried unsuccessfully to contact Skinner.  Skinner told those he did speak to either that he had to look into their accounts (and then he never got back to them) or that they were locked into the fund for a three-year period and could not get their money back until that period lapsed.

138.   The Freedom Fund bank account was essentially depleted after Skinner distributed the proceeds from the Tides sale in fall 2019, and there was no $800,000 in principal with supposed profits left for Skinner to invest.

139.   Those Freedom Fund investors who were not paid back after the sale of the Tides property never consented to Skinner continuing to hold their money after the Tides property was sold.

140.   To this day, Skinner owes these 16 Freedom Fund investors their invested principal of roughly $800,000.

141.   Throughout the course of the Freedom Fund Offering, Empire West

received over $1.1 million in total payments from the Freedom Fund, and Skinner transferred at least $250,000 of that to himself.

### E.   The Simple Growth Offering

142.   In mid-2018, Skinner began raising money for the Simple Growth Offering, which he marketed as a high-yield real estate investment bond. Skinner and his sales representatives told investors that Simple Growth would pool their money to buy and sell real estate, and more specifically to fund multi-family real estate investment projects in emerging markets.

143.   Skinner touted guaranteed and fixed returns for the Simple Growth Offering. The Simple Growth website described the investment as "simple," "easy," and less risky than the stock market, and claimed it would be "almost impossible" for investors to lose money.

144.   The promised high returns, and the touted safety of the investment, were important to investors in making their investment decisions.

145.   Skinner represented that the Simple Growth Offering proceeds would be invested in multi-family real estate projects that could generate the promised high returns, or in a business that was making such potentially profitable investments.

146.   Skinner and the sales representatives marketed the Simple Growth Offering via an undated prospectus (the "Simple Growth prospectus"), which they provided to investors.

147.   The Simple Growth prospectus described the Simple Growth Offering as the chance to "Invest in High Performance Multi-Family Real Estate In Emerging U.S. Markets," representing that "[t]he funds are used to acquire apartment projects, renovate, make deposits on land and assets," and noting that the investment is "short term, in order to limit the investors exposure and mitigate risk."

148.   The Simple Growth prospectus described cash flow apartment buildings as "among the safest, most secure, stable asset classes to own" and described them as a "safe haven for market correction," in contrast to the volatile stock market. The

prospectus further explained, "The funds are also diversified, so all your eggs will never be [in] one basket, and are secured by the tens of millions in equity, and cash flow that the company already owns."

149.   Simple Growth did not in fact own tens of millions of dollars in equity or cash flow at any point during the Simple Growth Offering.

150.   The Simple Growth prospectus also stated, "It's simple!  Select the amount of time you'd like to invest and the rate of return you'd like to make," and then included a graphic showing how much interest an investor would make from a $100,000 investment depending on how long he or she invested.

151.   Skinner and the sales representatives also marketed the Simple Growth Offering pursuant to a PPM dated May 16, 2017 (the "Simple Growth PPM"), which they provided to some prospective investors.

152.   The first page of the Simple Growth PPM indicated that Simple Growth's number one principal investment objective was to "[p]reserve and protect the Company's original invested capital."

153.   The "Use of Proceeds" section for the Simple Growth PPM stated, "The Company intends to utilize the proceeds raised in this Offering towards short term loans to affiliated and non-affiliated parties involved in real estate investment seeking loans for the short-term for their respective real estate projects. The Company may use some of the proceeds as deposits to secure real estate properties as well as making short-term investments.  The balance will be utilized for overhead and administrative expenses.  If the Company becomes aware of a suitable real estate investment opportunity, it may determine to invest in such an opportunity."

154.   The PPM further stated, "The Company intends to use the proceeds from this offering to fund short-term loans to affiliated and non-affiliated parties involved in the real estate investments.  The Company will earn interest on these short-term loans.  If the Company finds a suitable real estate investment opportunity, then the Company may decide to invest in that opportunity if the Company has sufficient

funds with which to do so.  The Company may utilize the proceeds from this offering to pay its general operating costs, make deposits on properties it is considering acquiring and short-term investments."

155.  The Simple Growth PPM stated that management "has agreed to guarantee the repayment of the Notes" and that "[i]nvestors shall not be charged any fees for their Notes."

156.  Simple Growth's sales representatives told prospective Simple Growth investors that the funds they invested would be used to acquire and transact real estate.  Skinner personally directed his sales representatives to market the Simple Growth investment in this way.

157.  Skinner maintained a Simple Growth website that was viewed by prospective investors.  The headline on the website read, "How to Predictably Beat Wall Street Every Year With Less Risk And More Consistency Without Adding Any Extra Work To Your Already Busy Schedule…"  The website stated that investors could beat the stock market every year by investing in Simple Growth.

158.  The Simple Growth website described Simple Growth as a high-yield real estate bond "that pays out quarterly with consistency and predictability, so you don't have to think about your investment account except the excitement you will feel watching it grow."  The page also described the investment's "Predictable High Yield Performance," stating that investors would receive a "predetermined, fixed, and predictable return on their investment that is paid out no-matter-what, and is not dependent on a certain project or property's performance."

159.  The Simple Growth website repeatedly emphasized the simplicity of the investment.  Under a section titled "Here's How It Works," the website listed three steps—(1) "You Decide How Long You Want To Invest Your Money," (2) "You Decide How Much Interest You Want to Earn," and (3) "You Decide How You Get Paid."  This section ended with the statement "It's That Simple!" in large bold letters.

160.  The Simple Growth website further stated: "Anyone can invest in

Simple Growth.  You don't need to be Accredited (someone who earns $200K a year or has a net-worth of over $1Million).  You don't need to be a sophisticated investor, and you can get started with as little as $10,000."

161.   The Simple Growth website also described the Simple Growth investment as "perfect for a Self-Directed IRA," offering to help investors facilitate the retirement account rollover process.

162.   The Simple Growth website indicated that it would be "almost impossible" for investors to lose money.  More specifically, the website stated, "Simple Growth is backed by the overall performance of my entire firm, Empire West Equities, Inc., and our entire portfolio of cash flowing apartment buildings.  So the only way this could fail is if the whole company fails –which would require hundreds and hundreds of my tenants to decide to stop paying their rent altogether. Highly unlikely!!! And almost impossible!!"

163.   Simple Growth did not in fact have a portfolio of hundreds and hundreds of apartment units (or tenants) that backed the investment.

164.   The Simple Growth website claimed that Simple Growth could offer investors a higher return than they could find anywhere else.  More specifically, the website stated, "[I]n the last ten years, the LOWEST annual rate of return [Skinner's] apartment deals have generated for my investors is 18% - that's how I can pay you 12% for your money and we can all stay in a very safe position."

165.   This representation was false, because it omitted the fact that Skinner was unable to repay all the investors in the Freedom Fund Offering.

166.   The publicly available Simple Growth website linked directly to the Simple Growth prospectus.

167.   On November 11, 2018, Skinner posted a publicly available Facebook message on his personal Facebook page (@mattskinnerinvestments) where he touted Simple Growth as "an easy way to begin investing in real estate."  This message included a video about Simple Growth and also linked to the since-removed Simple

Growth and Matt Skinner Investments websites.

168.   Skinner's November 11, 2018 Facebook post linked to a short video touting the Simple Growth investment opportunity.  This video was also available on the Simple Growth website.  The video narrator described Simple Growth as a "simple, easy way to invest in real estate," explaining that "Simple Growth is invested in real assets like cash-flowing apartment buildings and commercial assets." It further cited Simple Growth's "Secure Interest Rate" and explained, "You get a quarterly check and all of your principal investment back safely in your pocket at the end of the term.  It's that simple!"  The video described Simple Growth as "short term and high yield, giving you the best of both worlds."  The video concluded by describing the investment as "IRA approved" and "simple, easy, fun."

169.   This Simple Growth video also described Matt Skinner as "own[ing] a multi-family portfolio worth tens of millions of dollars."

170.   At no point during the Simple Growth Offering did Skinner or any entity under his control own a multi-family portfolio worth tens of millions of dollars.

171.   On April 3, 2019, Skinner posted another message on his publicly available Facebook page touting the Simple Growth Offering and encouraging people to invest from their retirement accounts.  In this post, Skinner claimed Simple Growth would get investors closer to "Financial Freedom" by investing them in "stable, secure real estate" where they could "earn a minimum of 10% a year without doing any work."  Skinner further described Simple Growth as "a 12 month term, pays 10% interest, and is invested only in safe and secure short term opportunities."  He claimed to be "open[ing] the doors to [his] very elite investment group" to only "a handful of new people."  He also encouraged investors—"Don't get left out in the cold . . . ROLL YOUR IRA over into a solid real estate investment."

172.   The April 3, 2019 Facebook post linked to a short video where Skinner touted Simple Growth as a great investment for someone who had never invested before.  He described the Simple Growth Offering as a "safe, secure, stable, massive,

passive income," claiming that it was secured by his portfolio of apartment buildings.

173.   Based on the written and oral representations they received from Skinner and Simple Growth, investors understood that the money they invested would be pooled with other investors' funds in a business that was actively engaged in making profitable investments in apartment buildings.

174.   It was important to Simple Growth investors that the money they invested be used to finance real estate investments that could achieve the high returns that Simple Growth marketed and guaranteed.

175.   Through written and oral representations, Skinner and Simple Growth described the Simple Growth investment to investors as low risk with guaranteed quarterly payments and a high, double-digit annual return.

176.   Skinner himself described the Simple Growth investment as being very safe and secure in conversations with multiple investors.

177.   In or about fall 2018, Skinner told one investor who raised concerns about liquidity that she would be able to pull out her $100,000 investment whenever she wanted, which was very important to her in making her decision to invest.

178.   The depiction of the Simple Growth investment as low-risk and guaranteed was an important factor in investors' decisions to invest in Simple Growth.

179.   The promise of high, double-digit annual returns was also important to the investment decisions made by Simple Growth investors.

180.   Skinner exercised full control over the Simple Growth bank account.

181.   Between July 2018 and June 2020, Skinner raised roughly $1.3 million for Simple Growth and persuaded Freedom Fund investors to "roll over" more than $400,000 in principal into Simple Growth.  Skinner did not invest them in any real estate projects.  Instead, he used it on a combination of personal expenses and expenses to fund his marketing and fundraising efforts.

182.   For instance, Skinner sent over $371,000 of Simple Growth investor

money to his personal bank account and used that money to finance personal expenses such as payments for automobiles including an Aston Martin and a Maserati, support payments to his ex-wife, and other daily living expenses, including rent for his personal residence and multiple restaurant meals.

183.  Skinner also used Simple Growth investor funds to pay off approximately $323,000 in credit card charges. The expenses charged to the credit card included multiple stays at a Laguna Beach resort and European vacations. The credit card charges also included marketing and fundraising expenses.

184.  Because Skinner did not invest Simple Growth investor money into any actual real estate projects, he had no revenue to pay investors their guaranteed quarterly interest payments. Skinner made at least $185,000 in Ponzi-like payments to Simple Growth investors.

185.  In November 2018 and then again in May 2019, Skinner transferred a total of $80,000 in Simple Growth investor money through Empire West to the Freedom Fund bank account, and he then used that money to make Ponzi-like distribution payments to Freedom Fund investors.

186.  While he was raising money for Simple Growth, Skinner told a former employee that he knew he was not using the Simple Growth money as represented but that he was not concerned because he would always have new investor money coming in that he could use to pay back investors.

187.  Skinner and Simple Growth never told Simple Growth investors that Skinner would use Simple Growth investor funds for his personal living expenses.

188.  Simple Growth investors would not have invested in Simple Growth had they known that Skinner would use any of their funds to pay for his own personal living expenses.

189.  Skinner and Simple Growth never represented or suggested to investors that Skinner would use any of the Simple Growth investor funds to pay for his business's general marketing and fundraising expenses, or his coaching programs.

190.   Simple Growth investors would not have invested in Simple Growth had they been told that Skinner would use their funds to pay for his business's general marketing and fundraising expenses, or his coaching programs.

191.   Simple Growth investors understood based on the representations they received that the money they invested would be going into real estate investments that could generate high, guaranteed returns.

192.   By March 2020, Simple Growth's bank account balance was less than $200.

### F.   COVID-19 Lulling and Other False Statements

193.   In late March 2020, the terms for certain Simple Growth investors matured, and some Freedom Fund investors requested to be paid back.

194.   Skinner falsely cited economic dislocation caused by the COVID-19 pandemic as the reason why he could not pay them and would need to defer distributions.

195.   For example, Skinner told Freedom Fund Investor O that he would be paid back by certain dates, first telling him he would be paid by February 2020. When February 2020 arrived, Skinner moved the date back to March 2020.  On March 12, 2020, Skinner personally told Investor O that he would pay him by March 15, 2020.  Skinner did not pay Investor O back by March 15, instead emailing him on March 21, 2020 asking him to extend his investment, which Investor O refused to do.

196.   Skinner sent Investor O a text on March 21, 2020, stating "With the current epidemic and quarantine Freedom Fund is not liquid to return your investment on its maturity date," again asking Investor O to agree to extend his investment. When Investor O inquired where his money was, Skinner claimed, "The money in your account is invested in real estate deals.  I expected one of our assets to sell a few weeks ago and it did not."  This statement was false.

197.   Skinner also pressured Simple Growth and Freedom Fund investors to extend their investments by making false and misleading statements regarding

Empire West's supposed "equity" in other projects (including Longacre and Bayside), telling investors that their investments were "SAFE."

198.   For instance, on March 31, 2020, Skinner sent an email to Simple Growth investors in which he asked them to extend their investment terms for a year, citing the COVID-19 pandemic as the reason why he could not liquidate assets to pay them back at that time.   The email continued, saying, "Your principal is SAFE; our portfolio is sound; and with your help we intend to keep it that way."   Skinner recommended that the Simple Growth investors extend their investment terms by a full year, offering them a three percent extension bonus.   In this same email, Skinner cited the Bayside and Longacre projects, as well as his interest in another apartment investment, as projects in which Empire West held millions of dollars in equity that he would eventually liquidate after the quarantine to satisfy what he owed the Simple Growth investors.   The March 31 email included a link to a document for the investors sign to extend their investment terms.

199.   Skinner sent an essentially identical March 31, 2020 email to certain Freedom Fund investors.   He also sent a text message with similar content to certain Freedom Fund investors on March 21, 2020, telling them their investments were safe and asking them to extend their investment terms.

200.   In response to Skinner's March 31, 2020 email, multiple Simple Growth and Freedom Fund investors told Skinner in unequivocal terms that they would not agree to his proposed extensions of their investment terms and that they wanted to be paid back immediately.

201.   Skinner did not pay back the Simple Growth or Freedom Fund investors who refused to extend their investment terms.   Instead, he unilaterally extended their investment terms, telling one of his bookkeepers that the investors would be receiving extensions whether they liked it or not.

202.   In fact, Skinner continued to send investors almost daily automated DocuSign emails for weeks asking them to extend their investment terms, even after

many had clearly told him they had no interest in doing so.

203.   Some Simple Growth investors agreed to the extensions based on Skinner's false statements in his March 31, 2020 email (and other nearly identical messages he sent repeatedly via DocuSign) that indicated that their principal was safe.

204.   On April 30, 2020, Skinner sent another email to certain Simple Growth investors that cited the COVID-19 "global crisis" and stated that "shutting down the global economy for the last few months has taken its toll on so many." Skinner continued, "For this reason we are deferring the First Quarter distribution until we get past this situation. Distributions will be caught up as soon as possible." Skinner against stated, "I want you to know that your principal is SAFE; our portfolio is sound; and we intend to keep it that way. The only way to lose in real estate is to sell low." The April 30, 2020 email from Skinner attached investor account statements that showed that the Simple Growth bonds had continued to accrue interest during the first quarter of 2020 and that this amount had been added to the investors' principal balances.

205.   On June 30, 2020, Skinner sent another email to Simple Growth investors.   In this email, Skinner represented that "a sale was cancelled in March when news of the quarantine broke, leaving Simple Growth illiquid to return your principal investment when it matured." Skinner purported to attach "a list of assets, their addresses, and approximate equity in each deal (exceeding the total debt Empire carries) that backs your investment." In this attachment, Skinner included an "estimated equity" amount of $4.4 million for Bayside and $2.1 million for Longacre. Skinner also included account statements that showed that Simple Growth investors had continued to accrue interest on their investments during the second quarter of 2020, which was added to their principal balances.

206.   Skinner sent a nearly identical June 30, 2020 email to Freedom Fund investors with the same attachment regarding Empire West's supposed equity in other

properties, as well as account statements that showed the Freedom Fund investors were continuing to accrue interest.  These account statements also showed that Freedom Fund investors had received profits from their investments in the Tides property, and those profits, along with the accrued interest, were added to the principal balance numbers.

207.   In reality, Simple Growth was illiquid  and unable to pay back investors because Skinner had spent all the Simple Growth investor money and had not invested in any real estate project.

208.   In the June 30, 2020 email, Skinner's "estimated equity" number of $4.4 million  for Bayside Equity's investment in the Bayside Offering was heavily inflated. This number simply assumed that Empire West would receive all profits from Bayside Equity's investment in Bayside, when in reality Skinner owes the Bayside Equity investors at least half of any profits.  Moreover, the equity number assumes that Bayside Equity is entitled to 20% of the total project profits, when it is only entitled to 20% of 45% of the profits.  Lastly, the "estimated equity" figure failed to account for the fact that Skinner owes $3.1 million  in principal from investors but put only $2 million  into the project.

209.   In the June 30, 2020 email, Skinner estimated that Empire West had $2.1 million  in equity in the Longacre project.  This number was also heavily inflated.  It assumed that Empire West would receive all profits from the Longacre project, when in fact Longacre investors are entitled to at least 50% of any profits, and Skinner's partner is entitled to 25%.

210.   Throughout the March 2020 to June 2020 timeframe, Skinner told investors on many phone conversations that their invested principal was safe and that that he easily had enough equity in various properties to be able to pay them back when he could liquidate the properties, representing that he would likely be able to do so in a few months.

211.   Skinner never told any of the Simple Growth or Freedom Fund investors

that he had spent their money and that it had not actually been invested in the projects that he was claiming backed their investments.

212.   Skinner stopped making distributions in February 2020.  Until late 2020, Skinner continued to send investors updates and account statements indicating that their investments were safe and that they were accruing interest.

213.   In March 2021, Skinner received the proceeds from the sale of units in an Arizona apartment building that he had cited as being part of Empire West's "equity" that backed up what he owed the Simple Growth and Freedom Fund investors.  He used these proceeds to repay the investors in that apartment project.  Skinner also took a portion of the proceeds for himself, withdrawing $19,000 in cash and transferring roughly $60,000 through a business account to his personal bank account.  Skinner did not use any of the proceeds from this sale to pay back Simple Growth or Freedom Fund investors, though he had been telling them for months that equity in the units in this apartment building was part of what backed up the amounts that he owed them.

214.   Skinner has not paid back the Simple Growth investors and 16 of the Freedom Fund investors.  He owes the Simple Growth investors roughly $1.7 million in invested principal and the Freedom Fund investors roughly $800,000 in principal.

## G.   Defendants' Misstatements Were Material

215.   Across the Offerings, investors considered Skinner's statements regarding the use of the offering proceeds to be very important.

216.   Skinner's representations regarding the use of proceeds were false; Skinner misused the Offering proceeds in the following ways:

217.   Skinner raised $2.4 million through Longacre by representing to investors that he would use the money to purchase and develop four hilltop residential lots in Granada Hills, California.  Skinner Instead, he diverted over $1.2 million from the project, using it for marketing costs, personal expenses, and a different real estate project.

218.   Skinner raised $3.1 million through Bayside by telling investors that they would receive an interest in the development of two waterfront homes in Newport Beach.  Skinner misrepresented the extent of his's interest in this project, inflated the projected returns, and sent only $2 million to the project, spending the remaining $1.1 million on unrelated things, including substantial personal expenses.

219.   Skinner raised over $2.6 million through Freedom Fund, telling investors that Freedom Fund would purchase and renovate an Arizona apartment building.

220.   Skinner directed over $1.1 million from Freedom Fund to Empire West, and failed to pay back 16 investors roughly $800,000 in principal when Freedom Fund's only asset was sold.

221.   Skinner raised over $1.3 million through Simple Growth by telling investors he would invest their money in multifamily real estate, and guaranteeing double-digit returns "no matter what."  Instead, Skinner spent the investor funds on general payroll, personal expenses, and Ponzi payments, never putting the money into any real estate project.

222.   Skinner made his false statements to various investors orally in presentations and conversations, and in writing in the offering documents for the Offerings.

223.   The false statements made by Skinner are attributable to the entity Defendants controlled by Skinner.

224.   Skinner's false statements helped him raise millions of dollars, and he received money as a result because he misappropriated investor funds.

225.   Empire West likewise received money by means of the false representations, from investors who received those representations and subsequently invested because Skinner transferred investors' funds to Empire West.

**H.   Defendants Acted With Scienter**

226.   Skinner knew, or was reckless or negligent in not knowing, that his representations regarding Longacre, Bayside, Freedom Fund, and Simple Growth

34

were false and misleading.

227.   Skinner's scienter is attributable to the entity Defendants because he controlled each of the them.

**I.   Registration Violations:  Sections 5(a) and 5(c) of the Securities Act**

228.   Defendants offered and sold securities, raising at least $9 million from over 100 investors throughout the U.S. from 2015 to 2020.

229.   The Offerings were never registered with the SEC, and the securities were offered and sold through interstate commerce.

230.   The Offerings were not exempt from registration.

231.   Defendants' manner of raising money constituted general solicitation. Many of the investors had no preexisting relationship with Defendants.

232.   For each of the Offerings, Defendants raised money from some unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated.

233.   Investors in the Offerings were not furnished with financial statements or an audited balance sheet or equivalent.

234.   Empire West, as the manager of the issuers, directly and indirectly offered and sold securities.  Empire West coordinated sales presentations and handled investor funds.  Empire West did not furnish investors with financial statements or an audited balance sheet or equivalent.

235.   Longacre, as the issuer of the securities, directly offered and sold securities through a general solicitation, raising around $2.4 million from at least 30 investors throughout the U.S. from February 2015 to March 2017.  Longacre engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Longacre had no preexisting substantive relationship.  These efforts included marketing the offering through Skinner's publicly available websites and social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and

touting the Longacre offering at networking events. Longacre raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated. Longacre did not furnish investors with financial statements or an audited balance sheet or equivalent.

236.    Bayside, as the issuer of the securities, directly offered and sold securities through a general solicitation, raising around $3.1 million from at least 50 investors throughout the U.S. from July 2015 to February 2018. Bayside engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Bayside had no preexisting substantive relationship. These efforts included marketing the offering through Skinner's publicly available websites and social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and touting the Bayside offering at networking events. Bayside raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated. Bayside did not furnish investors with financial statements or an audited balance sheet or equivalent.

237.    Freedom Fund, as the issuer of the securities, directly offered and sold securities. Freedom Fund offered and sold securities through a general solicitation, raising around $2.6 million from at least 47 investors throughout the U.S. from February 2017 to August 2018. Freedom Fund engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Freedom Fund had no preexisting substantive relationship. These efforts included marketing the offering through Skinner's publicly available websites and social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and touting the Freedom Fund offering at networking events. Freedom Fund raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated. Freedom Fund did not furnish investors with

financial statements or an audited balance sheet or equivalent.

238.   Simple Growth, as the issuer of the securities, directly offered and sold securities through a general solicitation, raising around $1.7 million from at least 25 investors throughout the U.S. from July 2018 to June 2020.  Simple Growth engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Simple Growth had no preexisting substantive relationship.  These efforts included marketing the offering through Skinner's publicly available websites and social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and touting the Simple Growth offering at networking events.  Simple Growth raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated.  Simple Growth did not furnish investors with financial statements or an audited balance sheet or equivalent.

239.   Skinner directly and indirectly offered and sold securities.

240.   Skinner directly solicited investors in the Offerings.  He directly offered and sold securities through a general solicitation, drafted the Offering documents, made video and live presentations to prospective investors.  He raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated.  He did not furnish investors with financial statements or an audited balance sheet or equivalent.

**J.     Violations of Section 15(a) of the Exchange Act**

241.   Skinner acted as an unregistered broker for the Offerings.

242.   Skinner purchased lead lists to solicit potential investors for the Offerings.  He also drafted and/or distributed the Offering documents, supervised the salespeople, solicited investors, and is involved in handling and responding to investor concerns.

243.   Skinner is not registered with the Commission as a broker-dealer in accordance with Section 15(b) of the Exchange Act, or associated with a registered

broker-dealer.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

243.   The SEC realleges and incorporates by reference paragraphs 1 through 227 above.

244.   Defendants made multiple false and misleading statements to investors in the Offerings.  These included statements that Defendants would invest in real estate, and guaranteeing double-digit returns.  Instead, Skinner misappropriated investor funds and spent them on his other businesses, general payroll, personal expenses, and Ponzi-like payments.  In the Simple Growth Offering, Defendants did not invest in any real estate at all.

245.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

246.   By engaging in the conduct described above, Defendants each violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

### (Against All Defendants)

247. The SEC realleges and incorporates by reference paragraphs 1 through 227 above.

248. Defendants made multiple false and misleading statements to investors in the Offerings. These included statements that Defendants would invest in real estate, and guaranteeing double-digit returns. Instead, Skinner misappropriated investor funds and spent them on his other businesses, general payroll, personal expenses, and Ponzi-like payments. In the Simple Growth Offering, Defendants did not invest in any real estate at all.

249. By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

250. By engaging in the conduct described above, Defendants each violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against All Defendants)

251.   The SEC realleges and incorporates by reference paragraphs 1 through 240 above.

252.   Defendants' offers and sales of the Longacre, Bayside, Freedom Fund and Simple Growth were not registered with the SEC and the securities were offered and sold through interstate commerce.  No exemption applies to Defendants' offers and sales of these securities.

253.    Longacre, as the issuer of the securities, directly offered and sold securities through a general solicitation, raising around $2.4 million from at least 30 investors throughout the U.S. from February 2015 to March 2017.  Longacre engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Longacre had no preexisting substantive relationship.  These efforts included marketing the offering through Skinner's publicly available websites and social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and touting the Longacre offering at networking events.  Longacre raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated.  Longacre did not furnish investors with financial statements or an audited balance sheet or equivalent.

254.   Bayside, as the issuer of the securities, directly offered and sold securities through a general solicitation, raising around $3.1 million from at least 50 investors throughout the U.S. from July 2015 to February 2018.  Bayside engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Bayside had no preexisting substantive relationship.  These efforts included marketing the offering through Skinner's publicly available websites and

social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and touting the Bayside offering at networking events. Bayside raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated. Bayside did not furnish investors with financial statements or an audited balance sheet or equivalent.

255. Freedom Fund, as the issuer of the securities, directly offered and sold securities through a general solicitation, raising around $2.6 million from at least 47 investors throughout the U.S. from February 2017 to August 2018. Freedom Fund engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Freedom Fund had no preexisting substantive relationship. These efforts included marketing the offering through Skinner's publicly available websites and social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and touting the Freedom Fund offering at networking events. Freedom Fund raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated. Freedom Fund did not furnish investors with financial statements or an audited balance sheet or equivalent.

256. Simple Growth, as the issuer of the securities, directly offered and sold securities through a general solicitation, raising around $1.7 million from at least 25 investors throughout the U.S. from July 2018 to June 2020. Simple Growth engaged in general solicitation by mass marketing the offering to prospective investors with whom Skinner and Simple Growth had no preexisting substantive relationship. These efforts included marketing the offering through Skinner's publicly available websites and social media accounts, running online ads, directly "cold calling" prospective investors whose information was included on investor lists Skinner purchased, and touting the Simple Growth offering at networking events. Simple Growth raised

money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated.  Simple Growth did not furnish investors with financial statements or an audited balance sheet or equivalent.

257.   Skinner is liable under Section 5 of the Securities Act because he directly solicited investors and was a necessary participant and substantial factor in the Offerings.  He directly offered and sold securities through a general solicitation, drafted the Offering documents, made video and live presentations to prospective investors.  He raised money from unaccredited investors and did not take reasonable steps to verify whether investors were accredited or sophisticated.  He did not furnish investors with financial statements or an audited balance sheet or equivalent.

258.   Empire West is liable under Section 5 of the Securities Act because as the manager of the issuers, it directly and indirectly offered and sold securities and was a necessary participant and substantial factor in the Offerings, coordinating sales presentations and handling investor funds.  Empire West did not furnish investors with financial statements or an audited balance sheet or equivalent.

259.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

260.   By engaging in the conduct described above, Defendants each violated, and unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c).

## FOURTH CLAIM FOR RELIEF

### Unregistered Broker-Dealer

### Violation of Section 15(a) of the Exchange Act

### (against Defendant Skinner)

261.   The SEC realleges and incorporates by reference paragraphs 1 through 243 above.

262.   Skinner has acted as an unregistered broker for the Offerings. Skinner solicited investors, supervised salespeople, drafted and/or distributed offering documents, and is involved in handling and responding to investor concerns. Skinner was not registered with the Commission as a broker-dealer in accordance with Section 15(b) of the Exchange Act, or associated with a registered broker-dealer.

263.   By engaging in the conduct described above, Defendant Skinner made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

264.   By engaging in the conduct described above, Defendant Skinner has violated, and unless restrained and enjoined, will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## IV.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Skinner and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## V.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Skinner and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from directly or indirectly, including but not limited to,

through any entity owned or controlled by him, (i) participating in the issuance, purchase, offer, or sale of any security in an unregistered offering, provided, however, that such injunction shall not prevent him from buying or selling securities for his own personal account; or (ii) obtaining or receiving any additional funds, payments, or other forms of consideration related to or derived from Longacre Estates, LP or Bayside Equity, LP, or the underlying real estate development projects in which those entities are invested; and (iii) ordering Skinner him to provide a copy of the final judgment in this action to 2209 Bayside, LP and to any third party that has reached any agreement in principle to purchase any interest or right held by Bayside Equity, LP or Longacre Estates, LP, including their interests and rights with respect to the underlying Bayside or Longacre real estate projects.

## VI.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  June 29, 2021

/s/ Lynn M. Dean
Lynn M. Dean
Christopher A. Nowlin
Attorney for Plaintiff
Securities and Exchange Commission

46